UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

WALTER CUMMINGS,

       Plaintiff,

v.

PAUL KLEE *et al*,

       Defendants.

_____/

Case No.: 14-10957

Arthur J. Tarnow
*United States District Judge*

Stephanie Dawkins Davis
*United States Magistrate Judge*

**REPORT AND RECOMMENDATION:
DEFENDANT JINDAL'S MOTION FOR
<u>SUMMARY JUDGMENT (Dkt. 201)</u>**

## I.    PROCEDURAL HISTORY

Plaintiff, an inmate currently in the custody of the Michigan Department of Corrections, brings this action under 42 U.S.C. § 1983, claiming a violation of his rights under the United States Constitution.  (Dkt. 1).  On September 12, 2018, the Court adopted the undersigned's report and recommendation on the defendants' motions for summary judgment and on defendant Jindal's motion to dismiss.  (Dkt. 191).  The undersigned recommended that, as to Jindal, all claims against her be dismissed except for Cummings' deliberate indifference claims for health care rendered on September 26, 2013 after his fall down the stairs and for the failure to provide medical accommodations for his disability and use of a wheelchair.  (Dkt. 185, 191).  On October 9, 2018, District Judge Arthur J. Tarnow referred all

pretrial matters to the undersigned.  (Dkt. 200).  With permission of the Court, Jindal filed a motion for summary judgment.  (Dkt. 201).  While proceeding *pro se*, Cummings filed a response.  (Dkt. 205).  Cummings was then appointed counsel (Dkt. 210), who filed an amended response and argued on Cummings' behalf.  (Dkt. 216).  A hearing on the matter was held May 16, 2019.  As detailed below, genuine issues of material fact remain to be decided, so I recommend that Jindal's motion be denied.

## II.    FACTUAL BACKGROUND

At all times relevant to the claims in his Amended Complaint Cummings was confined at the Gus Harrison Correctional Facility (ARF), and Jindal was a physician's assistant and medical provider at ARF.  (Dkt. 201 – Exhibit B, Jindal Affidavit, at ¶ 1-2).  Cummings's claims in his Amended Complaint arise out of two events that occurred on the same day: his move to a wheelchair non-accessible unit after having been afforded the accommodation of a barrier-free unit during a preceding period of months and his medical treatment after a fall down the stairs on September 26, 2013.  Cummings has used a wheelchair since about 2011 ("three plus years" pre-dating the filing of his original complaint).  (Dkt. 82, at ¶ 13, Dkt. 1 at ¶ 13).

Neither party contests what is in the medical records attached to Jindal's motion and Cummings' response;[1] instead, they contest the interpretation of the facts.  The records show the following with regard to the wheelchair accommodations.  On August 8, 2012, Jindal ordered for Cummings to receive an accommodation for wheelchair use for long distance only with a stop date of August 8, 2013.  (Dkt. 203 - Medical Records, Pg ID 1945).  Two weeks later, on August 22, 2012, Jindal added a further accommodation through August 8, 2013 for an attendant to assist Cummings with movement inside the prison.  (*Id.* at Pg ID 1950).  Despite the August 2012 accommodations he was afforded, in the latter months of 2012, Cummings filed kites complaining of falling while trying to put his wheelchair in his non-accessible cell and requested to be moved to an accessible cell.  (Dkt. 205, Pg ID 2041-49).  He variously reported severe pain in his lower back extending to his legs and feet, headaches, chest pain, chest bruising and pain in his right hand from falls in that occurred in August and November 2012.  On November 28, 2012, in response to Cummings' complaints about inaccessible housing, Jindal gave a verbal order for a wheelchair accessible room.  (Dkt. 203, Pg. ID 1959).  On November 29th, Jindal updated his special accommodations to include barrier-free housing, a wheelchair accessible cell and a

---

[1] In the amended response to Jindal's motion for summary judgment, Cummings refers to the exhibits attached to the original response.  Cummings did not re-attach those exhibits to the amended response.

bottom bunk in the cell, and wheelchair use not limited to distances.  (*Id.* at Pg. ID 1963).  These accommodations were scheduled to end on August 8, 2013.  (*Id.* at Pg ID 1963).  However, on January 14, 2013, Jindal updated Cummings' records to reflect the following reduced special accommodations: bottom bunk housing, a walker for short-distance use, and a wheelchair for long-distance use; she removed the accommodations for a barrier-free cell, wheelchair-accessible housing and wheelchair use for all distances.[2]  (*Id.* at Pg ID 1969).  She noted that, during this visit, Cummings was able to ambulate from his wheelchair to the examination table with a slow but steady gait with some assistance – grasping surrounding objects such as a door and bookshelf.  (*Id.* at Pg ID 1967).  She renewed the updated – i.e. more limited – accommodations after seeing him on September 9, 2013 for one year.  (*Id.* at Pg ID 1975).  During the September 9th visit, Jindal encouraged Cummings to increase his exercise.  (*Id.*).

A little over two weeks later, defendant nurse Ellenwood treated Cummings after a fall down the stairs on September 26, 2013 which was captured on videotape.  (Dkt. 15, Exhibit 5).  Cummings complained of pain in his lower back

---

[2] Even though the record reflects that Jindal ordered the accommodations to be reduced January 14, 2013, Cummings states twice in his verified amended complaint that he was moved to a non-accessible cell on September 26, 2013, and he uses this date as the date his accommodations ended.  (Dkt. 83, at ¶¶ 15, 55).  Jindal does not dispute Cummings' representation.  Thus, it is unclear whether Jindal's change order was implemented before September 26, 2013.  The undersigned will accept Cummings' representation and will consider the deliberate indifference claim regarding lack of appropriate accommodations to be confined to the period between September 26, 2013, through his transfer to another prison in January 2014.

and the back of his head.  (Dkt. 203, at Pg ID 1976).  Ellenwood saw no signs of injury to his head or lower back.  Ellenwood noted that Cummings used a wheelchair for distances but that he was moved to a unit without an elevator to encourage ambulation.  After he had been in healthcare for an hour, Cummings told her that he could not climb the stairs back to his cell and asked for an elevator special accommodation.  Ellenwood notified Jindal of this request but Jindal declined to discuss it with him.[3]  (*Id.*).  Ellenwood gave Cummings ice or a cold compress for his back.  (*Id.* at Pg ID 1977).  In the critical incident report, Ellenwood stated that she notified Jindal that Cummings refused to get up off the gurney and that Jindal said Cummings could "walk just fine when he wants to." (Dkt. 205, Pg ID 2037).

On September 27th and 30th, Cummings kited healthcare complaining of back and leg pain.  He was scheduled for a medical visit on October 1st.  (Dkt. 203, at Pg ID 1979-80).  Cummings presented to healthcare on October 1st with complaints of pain.  He stated that Tylenol did not help with the pain he experienced from having to crawl or scoot up and down the stairs.  (*Id.* at Pg ID

---

[3] This medical record reflects that the "MSP" instructed Ellenwood to let Cummings "rest a while" in healthcare after the fall.  (Dkt. 203, at Pg ID 1977).  This record also reflects that the "MP" was notified of Cummings complaint that he could not the climb the stairs and request for the elevator accommodation.  (*Id.*).  Jindal identifies herself as the individual who instructed Ellenwood to let Cummings rest in healthcare (Dkt. 201, at p. 10) and as the individual who Ellenwood notified of the issue regarding climbing stairs (*Id.* at p. 4).  It appears, then, that the MSP and MP noted in the records, at least this particular record, is Jindal.

1985).  On October 1, 2013, medical staff gave him a hot compress and ACE wrap and referred him to Jindal for an assessment of his pain.  The nurse who treated him that day noted Cummings' complaints of pain and having to scoot on the stairs.  She was unable to assess his gait but found that he was able to scoot himself around in a wheelchair using his feet and that he did not appear to be in distress. (*Id.* at Pg ID 1983-87).

Cummings kited healthcare again on October 6, 2013, explaining that his move to a non-accessible cell on September 26, 2013 amounted to deliberate indifference to his serious medical needs, and that he fell down the stairs trying to get up them.  (Dkt. 205, Pg ID 2053).  The next day, Cummings was seen by Dr. Brady for neurologic/headache symptoms and a cardiovascular check.  Dr. Brady recommended that Cummings reduce his weight and "make efforts to exercise and increase his strength and ambulation."  (Dkt. 203, at Pg ID 1995).  Cummings disagreed with the advice to reduce his weight.  He requested to be moved to an elevator unit, but Dr. Brady advised that he should make attempts to be more independent.  (*Id.*).  An October 11, 2013 administrative note indicates that Cummings had submitted multiple kites alleging deliberate indifference regarding his removal from a barrier-free cell.  (*Id.* at Pg ID 1997).  Non-party nurse Kopka, who wrote the administrative note, indicated that Cummings was seen by Jindal on September 9, 2013, and Jindal reviewed his special accommodations.  Kopka noted

that Cummings' accommodation for a barrier-free cell was discontinued after it

expired on August 8, 2013, because his wheelchair accommodation was for

distances only. Kopka further indicated that Jindal is the only person who can

determine accommodations. (*Id*.).

On October 19, Cummings submitted a request for healthcare because he fell

again trying to get his wheelchair into his cell. (Dkt. 205, Pg ID 2059). On

October 26, 2013, Cummings complained that he hurt his knees, hip, and lower

back trying to use a shower that was inaccessible to disabled inmates. (Dkt. 205,

Pg ID 2063). Cummings also stated that healthcare's failure to accommodate his

disabilities made it unsafe, difficult, and painful to move in the prison. (*Id.*). The

nurse responding to the kite stated that the information had been forwarded to the

housing unit manager ("HUM") and that Cummings was scheduled to see a nurse

for an evaluation of his pain. (*Id.* at Pg ID 2064). On October 30th, a nurse

reviewed Cummings' complaints about having to crawl on the stairs and having an

inaccessible cell and shower. (Dkt. 203, at Pg ID 1998). The nurse indicated that

the nursing supervisor addressed the issue with the "MP." The MP stated that

Cummings was able to walk up and down the stairs and that he had an

accommodation for wheelchair use for distances only. On November 2, 2013,

Cummings kited healthcare again for pain from crawling up and down the stairs.

(Dkt. 205, at Pg ID 2065). The responding nurse explained that if he could not

walk on the stairs, he should try scooting instead of crawling.  (*Id.* at Pg ID 2066).

She further explained that Cummings could use the handrail to assist him in

lowering himself to a seated position on the stair and to use his upper body strength

to move along the stair treads.  She said he would experience less discomfort as his

strength increased.  (*Id.*).

On November 4, 2013, Jindal reviewed Cummings' medical chart.  She

noted that Cummings had been complaining of frequent falls or injury due to living

in a non-handicap cell.  Jindal stated that they would discuss the issue at the next

"CCC" visit.  (Dkt. 203, at Pg ID 2000).  On November 30, 2013, Cummings sent

a kite to healthcare complaining of pain in his buttocks, wrist, right shoulder, lower

back, hips and knees related to scooting up and down the stairs.  (*Id.* at Pg ID

2002).  The next day, non-party Nurse Velarde responded to the kite, commenting

that Cummings should continue to work on increasing his strength, increase the

amount of time he spends on his feet, and work on his balance and coordination.

Velarde stated that Cummings could do more to improve his function himself than

could be done by nursing or his medical provider.  (*Id.*).  On December 7, 2013, he

submitted another kite about falling while scooting up and down the stairs, hurting

himself.  (Dkt. 205, Pg ID 2071).  He was scheduled for an appointment for

evaluation of his injury and concerns.  (*Id.* at Pg ID 2072).  Cummings saw Dr.

Brady on December 9, 2013 for issues including musculoskeletal/back/knee pain.

Cummings requested a move to a more accommodating cell. (Dkt. 203, at Pg ID 2003). Dr. Brady noted that Cummings had an accommodation for a wheelchair for distances but appeared to use the wheelchair all the time. (*Id.*). Dr. Brady stated that he would discuss Cummings' issues with staff more familiar with his care to see if other accommodations were available. (*Id.* at Pg ID 2005). This is the last medical record until his transfer to another prison a few weeks later on January 2, 2014. (Dkt. 203, at Pg ID 2006). A physician's assistant at the new facility continued the special accommodation ordered by Jindal: bottom bunk housing, a walker, and wheelchair for distance on January 31, 2014. (*Id.* at Pg ID 2014). On January 13, 2015, Cummings' accommodations were changed to allow for "permanent" wheelchair use. (*Id.* at Pg ID 2016). On April 10, 2015, Cummings received a special accommodations order for a handicapped shower, a wheelchair pusher, and barrier free/wheelchair accessible housing on the ground floor with no steps, in addition to the permanent wheelchair use. (*Id.* at Pg ID 2021, 2022).

In her affidavit attached to her motion for summary judgment, Jindal recounts the involvement she had in Cummings' medical care based on the medical record beginning in August 2012 until his transfer to another prison on January 21, 2014, as recounted above. (Dkt. 201-2, ¶¶ 3-22). She avers that, in her medical

judgment, it was important to encourage Cummings to ambulate and improve his strength, rather than simply resign himself to life in a wheelchair.  (*Id.* at ¶ 25).

## III.   ANALYSIS AND RECOMMENDATIONS

### A.   Introduction

Prior to the hearing on the motion for summary judgment, Cummings withdrew his Eighth Amendment claim about the care he received immediately after his fall on September 26, 2013.  (Dkt. 222, Joint Statement of Unresolved Issues).  At the hearing, Cummings' counsel confirmed on the record that the only remaining claim against Jindal is the claim that Jindal's failure to provide further accommodations for wheelchair use amounted to deliberate indifference.

### B.   Standard of Review

When a party files a motion for summary judgment, it must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(a).  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record...; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed.R.Civ.P. 56(c)(1).  The standard for determining whether summary judgment is appropriate is "whether the evidence presents a sufficient disagreement to

require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *State Farm Fire & Cas. Co. v. McGowan*, 421 F.3d 433, 436 (6th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). Furthermore, the evidence and all reasonable inferences must be construed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co.*, *Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Where the movant establishes the lack of a genuine issue of material fact, the burden of demonstrating the existence of such an issue shifts to the non-moving party to come forward with "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). That is, the party opposing a motion for summary judgment must make an affirmative showing with proper evidence and must "designate specific facts in affidavits, depositions, or other factual material showing 'evidence on which the jury could reasonably find for the plaintiff.'" *Brown v. Scott*, 329 F.Supp.2d 905, 910 (6th Cir. 2004). In order to fulfill this burden, the non-moving party need only demonstrate the minimal standard that a jury could ostensibly find in his favor. *Anderson*, 477 U.S. at 248; *McLean v. 988011 Ontario*, *Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). However, mere allegations or denials in the non-movant's pleadings will not satisfy this burden, nor will a mere scintilla of evidence supporting the non-moving party. *Anderson*, 477 U.S. at 248, 251.

The Court's role is limited to determining whether there is a genuine dispute about a material fact, that is, if the evidence in the case "is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. Such a determination requires that the Court "view the evidence presented through the prism of the substantive evidentiary burden" applicable to the case. *Id*. at 254. Thus, if the plaintiff must ultimately prove its case at trial by a preponderance of the evidence, on a motion for summary judgment the Court must determine whether a jury could reasonably find that the plaintiff's factual contentions are true by a preponderance of the evidence. *See id.* at 252-53. Finally, if the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the movant is entitled to summary judgment. *Celotex*, 477 U.S. at 323. The Court must construe Rule 56 with due regard not only for the rights of those "asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury," but also for the rights of those "opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis." *Id*. at 327.

C.   Discussion

In the context of medical care, a prisoner's Eighth Amendment right to be free from cruel and unusual punishment is violated only when the prisoner can

12

demonstrate a "deliberate indifference" to his serious medical needs.  *Estelle v. Gamble*, 429 U.S. 97, 104-06 (1976).  "Where a prisoner has received some medical attention and the dispute is over the adequacy of treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims that sound in state tort law."  *Westlake v. Lucas*, 537 F.2d 857, 860 n. 5 (6th Cir. 1976) (citations omitted).  Further, mere negligence in identifying or treating a medical need does not rise to the level of a valid mistreatment claim under the Eighth Amendment.  *Estelle*, 429 U.S. at 106.

A viable Eighth Amendment claim has two components, one objective and the other subjective.  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2002).  A court considering a prisoner's Eighth Amendment claim must ask both if the alleged wrongdoing was objectively harmful enough to establish a constitutional violation and if the officials acted with a sufficiently culpable state of mind.  *Hudson v. McMillian*, 503 U.S. 1, 8 (1992).

Under the objective component, "the plaintiff must allege that the medical need at issue is 'sufficiently serious.'"  *Farmer*, 511 U.S. at 834.  Courts recognize that "[b]ecause routine discomfort is part of the penalty that criminal offenders pay for their offenses against society, only those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation."  *Hudson*, 503 U.S. at 8 (internal citations and

quotation marks omitted).  Similarly, "[b]ecause society does not expect that

prisoners will have unqualified access to health care, deliberate indifference to

medical needs amounts to an Eighth Amendment violation only if those needs are

'serious.'"  *Id.* at 9.  A plaintiff can demonstrate that a medical need is sufficiently

serious by showing that it is "'one that has been diagnosed by a physician as

mandating treatment or one that is so obvious that even a lay person would easily

recognize the necessity for a doctor's attention.'"  *Baynes v. Cleland*, 799 F. 3d

600 (6th Cir. 2005) (quoting *Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir. 2008));

*see also*, *Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 897 (6th Cir. 2004).  The

plaintiff can also establish the objective component by showing that the prison

provided treatment "so cursory as to amount to no treatment at all."  *Dominguez v.*

*Correctional Med. Servs.*, 555 F.3d 543, 551 (6th Cir. 2009).  But when a prisoner

has received on-going treatment and claims that this treatment was inadequate, the

objective component requires a showing of care "so grossly incompetent,

inadequate, or excessive as to shock the conscience or to be intolerable to

fundamental fairness." *See Miller v. Calhoun Cty.*, 408 F.3d 803, 819 (6th Cir.

2005) (quoting *Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir. 1989)).  As the

Sixth Circuit recently explained in *Rhinehart v. Scutt*, 894 F.3d 721, 737-38 (6th

Cir. 2018),

> The plaintiff must present enough evidence for a
> factfinder to evaluate the adequacy of the treatment

provided and the severity of the harm caused by the allegedly inadequate treatment. There must be "medical proof that the provided treatment was not an adequate medical treatment of [the inmate's] condition or pain." *Santiago v. Ringle*, 734 F.3d 585, 591 (6th Cir. 2013). This will often require "expert medical testimony ... showing the medical necessity for" the desired treatment and "the inadequacy of the treatments" the inmate received. *Anthony v. Swanson*, 701 F. App'x 460, 464 (6th Cir. 2017); *see Pearson v. Prison Health Serv.*, 850 F.3d 526, 535 (3d Cir. 2017) (explaining that adequacy-of-care claims may require expert testimony "to create a genuine dispute that the prisoner's medical needs are serious"). The plaintiff also must "place verifying medical evidence in the record to establish the detrimental effect" of the inadequate treatment. *Blackmore*, 390 F.3d at 898 (quoting *Napier v. Madison Cty., Ky.*, 238 F.3d 739, 742 (6th Cir. 2001)); *cf. Broyles v. Corr. Med. Servs., Inc.*, 478 F. App'x 971, 975 (6th Cir. 2012) (holding that defendant had "met this requirement" at the motion-to-dismiss stage "by alleging statements by [doctors] linking the delay in treatment to the permanency of his vision impairment").

The subjective component requires that the defendant act with deliberate indifference to an inmate's health or safety. *Farmer*, 511 U.S. at 834. Deliberate indifference "entails something more than mere negligence," *id.* at 835, but can be "satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.* To establish the subjective component, "the plaintiff must allege facts which, if true, would show that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded

the risk." *Id.* at 837.  In other words, this prong is satisfied when a prison official

acts with criminal recklessness, i.e., when he or she "consciously disregard[s] a

substantial risk of serious harm." *Brooks v. Celeste*, 39 F.3d 125, 128 (6th Cir.

1994) (citing *Farmer*, 511 U.S. at 839-40).

a.    Objective Component

As noted above, the claim about the medical care Cummings received on

September 26, 2013, in the aftermath of his fall down the stairs is no longer at

issue.  Therefore, the undersigned will only address the deliberate indifference

claim concerning accommodations.[4]  Jindal argues that, since she provided medical

treatment to Cummings on numerous occasions and ordered various special

accommodations, Cummings' claim is an adequacy of care claim, i.e. inadequate

accommodations.  (Dkt. 201, at p. 11).  Thus, Jindal says Cummings must

demonstrate harm caused by the allegedly inadequate treatment.  However,

according to Jindal, Cummings cannot show either that she failed to treat him or

that the treatment she provided was grossly inadequate and caused him harm.

(*Id.*).  Cummings disagrees.  He argues that prison officials cannot "insulate

themselves from liability" simply by providing some treatment.  "Less efficacious

treatment" can constitute deliberate indifference to serious medical needs.  (Dkt.

---

[4] As noted in footnote 2, *supra*, while the records reflect orders for a change in his accommodations in January 2013, the Court accepted Cummings' representation that the accommodations ended September 26, 2013.

216, at p. 14).  He says that Jindal's failure to provide accommodations for an elevator or an accessible cell meant that Cummings had to climb the stairs on his hands and knees and the accommodations request refusal denied him the "minimal civilized measure of life's necessities."  (*Id.* at p. 15) (citing *Farmer*, 511 U.S. at 834).

The evidence of Cummings' continued falls after his accommodations were taken away and pain and injury from crawling on the stairs and in the shower demonstrates that the accommodations were inadequate to the task of keeping him free of a serious risk of harm.  It is undisputed that Cummings' accommodations were not restored to their previous level or otherwise increased between his fall on September 26th and his transfer to the new prison in January 2014.  In other words, he was not granted a wheelchair accessible cell and he was only permitted a wheelchair for distances.  Cummings is 68 years old and very large – he stands at six foot seven and 250 pounds.  A fall down stairs at his age and size could result in serious injury.  And, after Jindal discontinued Cummings' accommodations, the record shows that he fell three times and reported pain and injury on multiple occasions.  His tumbles occurred on September 26th, October 19th, and December 7th, 2013—twice on the stairs and once trying to get his wheelchair into his cell.  Each time he fell, he was seen in health care either immediately after or shortly after.  (Dkt. 205, Pg ID 2060, 2062, 2072; Dkt. 203, Pg ID 1998, 2003-05).  After

his fall in October, a nurse recommended over-the-counter pain relivers and a warm compress for pain until his scheduled evaluation.  (Dkt. 205, Pg ID 2062). For his complaints of pain from maneuvering without a wheelchair on the stairs and in the shower, he sometimes received hot and cold compresses, or other pain medication to alleviate pain.  (Dkt. 203, at Pg ID 1986, 1198, 2003-05).   On December 1, 2013, as noted above, his complaint of pain from scooting on the stairs was met with the advice to continue to try to walk the stairs to increase his strength.  (*Id.* at Pg ID 2002).  Despite the pain relievers and advice to walk, he fell again on December 7th.

In short, despite the existing accommodations and pain relievers, Cummings continued to fall and endure pain from crawling around the prison, thus calling into question whether the accommodations and treatment constituted adequate medical care.  Indeed, plaintiff's evidence suggests that his unchanged accommodations may have increased the risk of injury rather than ameliorated it as plaintiff fell three times after his accommodations were limited while the record does not reflect any falls when he had full accommodations.  The medical evidence also demonstrates the detrimental effect of the treatment he received.  Continuing to advise Cummings to walk the stairs to increase his strength was ineffective. Instead, he fell three times and continued to hurt himself crawling on the stairs requiring repeated trips to healthcare and medication for his pain.   As such, a

18

reasonable jury could conclude that the treatment he was receiving was objectively

inadequate in view of his continued problems ambulating.

b.    Subjective Component

Jindal argues that Cummings' claim fails on the subjective component

because she assessed Cummings and implemented a treatment plan based on her

medical judgment on each occasion of her involvement, (Dkt. 201, at p. 12), and

that she was unaware of his falls after September 26, 2013.  At the hearing on the

matter, Jindal's counsel argued that when Jindal reviewed Cummings' chart after

September 26th, she would not have seen the records of his falls.  Counsel

explained that the medical records program used at the prison did not show all of

an inmate's medical records.  Rather, Jindal would select the medications (or

issues) she was to review and would see information related to those medications

only – not his complaints of falls and pain.  Jindal characterizes Cummings' claim

as merely a disagreement with her (and Dr. Brady's) medical opinion that he

should make an effort to ambulate and improve his strength.  She argues that a

difference in medical judgment between an inmate and prison medical personnel

about appropriate treatment is not enough to state a deliberate indifference claim.

*Westlake v. Lucas*, 537 F.2d 857, 860 (6th Cir. 1976).  In response, Cummings

contends that Jindal was skeptical of Cummings' truthfulness about his falls and

injuries.  (Dkt. 216, at p. 18).  According to Cummings, defendants Campbell,

McRoberts, and McConnel brought their opinions that Cummings faked his

September 26th fall to healthcare, and it is likely that Jindal heard of these opinions

and adopted them.  (*Id.* at p. 19).  Cummings "disputes Defendant's factual account

of Plaintiff's mobility following the fall on September 26, 2013."  (*Id.* at p. 20).

As to the first portion of the subjective inquiry, there are facts from which to

infer a serious risk of harm to Cummings in relation to the accommodations: he

had wheelchair accessible housing accommodations from November 2012 until

September 26, 2013 (*see* Dkt. 203, at Pg ID 1963; Dkt. 83, at ¶ 13) because of his

size, decreased ability to maneuver in a smaller cell, and his dependence on a

wheelchair for mobility (Dkt. 203, at Pg ID 1959); he was 68 years old, an older

inmate, at the time of the alleged events and had difficulty ambulating; and after

his housing accommodations were removed he repeatedly fell, injured himself, and

experienced pain from crawling on the stairs and in the shower.  From these facts,

a jury could reasonably infer that Cummings was in serious risk of falling again,

potentially seriously injuring himself and enduring seemingly needless pain from

being subjected to crawling and scooting about the prison.  And, despite argument

to the contrary, there is evidence to suggest that Jindal drew the inference.  The

record shows that Jindal was, in fact, aware of Cummings falls as late as

November 4, 2013 when she reviewed his record and noted he had been

complaining of falls caused by non-accessible housing.  (Dkt. 203, at Pg ID 2000).

She said his issues would be discussed at the next "CCC" visit.  It is not clear when this visit took place, although it may be the visit with Dr. Brady on December 9th when Dr. Brady addressed Cummings' chronic care issues.  (Dkt. 203, at p. 2003-05).  At a minimum, a jury could reasonably conclude that since Jindal recognized his issues with ambulation should be addressed, she drew the inference that there was a risk of harm.  Further, Cummings' claim that Jindal did not believe he was being truthful about his falls, while not definitively established, does have some basis in the record.  Specifically, Jindal stated that Cummings can "walk when he wants to" in response to Nurse Ellenwood's query to her.  She does not directly contest that Cummings fell on September 26th, or that he fell at other times in his cell or on the stairs.  Nevertheless, in the view of the Court, what Jindal meant by this statement bears directly on both whether she appreciated the risk and whether she ignored the risk of harm to Cummings.

There is also an issue of material fact as to whether she deliberately disregarded the risk by taking reasonable measures to abate it.  *See Rhinehart*, 894 F.3d at 738.  As noted, a plaintiff may rely on circumstantial evidence to demonstrate a defendant's deliberate disregard of a serious risk, but "must present enough evidence from which a jury could conclude that each defendant . . . '*consciously* expos[ed] the [prisoner] to an *excessive* risk of *serious* harm.'" *Id.* at 738–39 (6th Cir. 2018) (emphasis and alterations in original) (quoting *Richmond v.*

21

*Huq*, 885 F.3d 928, 940 (6th Cir. 2018)).  After Jindal's November 4th chart

update, it is unclear whether Jindal was aware of his third fall on December 7th or

his continued complaints of pain from crawling on the stairs.  While Jindal's

counsel contends that her chart reviews did not reveal his complaints, Jindal has

not presented the Court with any evidence such as a sworn statement to that effect

to substantiate this contention.  Thus, a jury could conclude that, since Jindal, as

Cummings' medical provider, had access to his medical records, and she

periodically reviewed those records, she was aware of all of his falls and

complaints of pain.  Viewing the facts in the light most favorable to Cummings,

Jindal, with knowledge of at least two falls and complaints of pain, did not give

him barrier-free housing and unlimited wheelchair use, at least until such time as

his ambulation issues could be fully addressed.  Jindal had the authority to change

his accommodations.[5]  Making him walk the stairs to increase his strength did not

appear to be working to change his ambulatory ability.  Indeed, the video of

Cummings' September 26th fall down the stairs appears to support this point.

(Dkt. 15, Exhibit 5). Cummings's issue is not merely a disagreement with the

accommodations; his claim is about being provided ineffective care to prevent

---

[5] Jindal had the authority to change Cummings' housing and wheelchair accommodations
herself.  In response to one of Cummings' kites, a nurse indicated that his medical provider,
Jindal in this case, is the only person who could determine his special accommodations.  (Dkt.
203, at p. 55).  Jindal does not contest that she had authority to change his accommodations, as
she did in 2012 and 2013.

falling and pain from crawling on the stairs.   There is sufficient evidence to suggest that Jindal knew of the danger and drew the inference of a risk of harm yet failed to take reasonable measures to ameliorate that risk of harm.  In light of the Supreme Court's caution that a prison official's denial of "the minimal civilized measure of life's necessities" could amount to cruel and unusual punishment, *Farmer*, 551 U.S. at 834 (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)), whether Jindal's failure to change Cummings' wheelchair accommodations amounts to deliberate indifference is a question for the jury.

## IV.   RECOMMENDATION

For the reasons set forth above, the undersigned **RECOMMENDS** that defendant Jindal's motion for summary judgment (Dkt. 201) be **DENIED**.

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d).  Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1981).  Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of*

*Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc.  Any objection must recite precisely the provision of this Report and Recommendation to which it pertains.  Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity.  Fed.R.Civ.P. 72(b)(2), Local Rule 72.1(d).  The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc.  If the Court determines that any objections are without merit, it may rule without awaiting the response.

 Date:  August 4, 2019                    s/Stephanie Dawkins Davis
                                          Stephanie Dawkins Davis
                                          United States Magistrate Judge

## CERTIFICATE OF SERVICE

I certify that on August 4, 2019, I electronically field the foregoing paper with the Clerk of the Court using the ECF system, which will send electronic notification to all counsel of record.

                              s/Tammy Hallwood
                              Case Manager
                              (810) 341-7887
                              tammy_hallwood@mied.uscourts.gov