UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

WALTER CUMMINGS,

    Plaintiff,

v.

PAUL KLEE, ET AL.,

    Defendants.

Case No. 14-10957

SENIOR UNITED STATES DISTRICT
JUDGE ARTHUR J. TARNOW

MAGISTRATE JUDGE STEPHANIE
DAWKINS DAVIS

_____/

**OPINION AND ORDER ADOPTING THE REPORT AND RECOMMENDATION [226]; OVERRULING DEFENDANT'S OBJECTION [227]; AND DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [201]**

> *Humpty Dumpty sat on a wall*
> *Humpty Dumpty had a great fall.*
> *All the King's horses and all the king's men*
> *Couldn't put humpty together again.*
>
> "Humpty Dumpty"[1]

Walter Cummings suffered many falls during his time at the Gus Harrison Correctional Facility. Though he was unable to function without a wheelchair and barrier-free housing, the prison medical providers believed that Mr. Cummings

---

[1] THE OXFORD DICTIONARY OF NURSERY RHYMES, ed. Iona & Peter Opie, Oxford: Oxford UP, 1997, pg. 213-15.

would somehow be healed or put back together again by the exercise of staggering, crawling, or scooting up and down the stairs of his facility. During this time, Mr. Cummings was 67-years-old, 6-feet 7-inches tall, and weighed 275 pounds. (Dkt. 203, PageID 1948). While he was afforded a wheelchair for longer travel, Mr. Cummings was deprived the use of a wheelchair for short distances. He was also moved from a cell on the first floor to a cell on the second. Somehow this was to make him whole.

After one great fall, prison guards allegedly told Mr. Cummings, "you should be in Hollywood, because we looked at your fall and it looked almost real." (Dkt. 82, pg. 9). The defendants surely would have been convinced that Mr. Cummings needed a wheelchair if, after one of his falls, he shattered into pieces like poor Mr. Dumpty. Though the defendants would have had the medical certainty so important to them, this would have been too late for Mr. Cummings, for neither all the king's horses nor all the king's men can put a man back together again once he is broken.

Seeking redress for the deprivation of his special accommodations, Mr. Cummings has brought claims pursuant to 42 U.S.C. § 1983 against Defendant Roselyn Jindal, P.A. — an employee of the private contractor Corizon — and various other officials of the Michigan Department of Corrections ("MDOC"). Before the Court is Defendant Jindal's Motion for Summary Judgment [201]. All pretrial matters, including this motion, had been referred [46] to Magistrate Judge

Stephanie Dawkins Davis. Pursuant to 28 U.S.C. § 636(b)(1), the Magistrate Judge held a hearing on the motion on May 16, 2019 and then issued a Report and Recommendation (R&R) [226] on August 4, 2019.

The R&R advises the Court to deny Jindal's Motion for Summary Judgment. Defendant objected to the R&R on August 19, 2019 [227]. For the reasons stated below, the Court will overrule that objection and follow the Magistrate Judge's recommendation to deny summary judgment.

## FACTUAL BACKGROUND

The factual background is set forth in the R&R as follows.

> At all times relevant to the claims in his Amended Complaint Cummings was confined at the Gus Harrison Correctional Facility (ARF), and Jindal was a physician's assistant and medical provider at ARF. (Dkt. 201 – Exhibit B, Jindal Affidavit, at ¶ 1-2). Cummings's claims in his Amended Complaint arise out of two events that occurred on the same day: his move to a wheelchair non-accessible unit after having been afforded the accommodation of a barrier-free unit during a preceding period of months and his medical treatment after a fall down the stairs on September 26, 2013. Cummings has used a wheelchair since about 2011 ("three plus years" pre-dating the filing of his original complaint). (Dkt. 82, at ¶ 13, Dkt. 1 at ¶ 13).
>
> Neither party contests what is in the medical records attached to Jindal's motion and Cummings' response; instead, they contest the interpretation of the facts. The records show the following with regard to the wheelchair accommodations. On August 8, 2012, Jindal ordered for Cummings to receive an accommodation for wheelchair use for long distance only with a stop date of August 8, 2013. (Dkt. 203 - Medical Records, Pg ID 1945). Two weeks later, on August 22, 2012, Jindal added a further accommodation through August 8, 2013 for an attendant to assist Cummings with movement inside the prison. (Id. at Pg ID 1950). Despite the August 2012 accommodations he was afforded, in the latter months of

2012, Cummings filed kites complaining of falling while trying to put his wheelchair in his non-accessible cell and requested to be moved to an accessible cell. (Dkt. 205, Pg ID 2041-49). He variously reported severe pain in his lower back extending to his legs and feet, headaches, chest pain, chest bruising and pain in his right hand from falls in that occurred in August and November 2012. On November 28, 2012, in response to Cummings' complaints about inaccessible housing, Jindal gave a verbal order for a wheelchair accessible room. (Dkt. 203, Pg. ID 1959). On November 29th, Jindal updated his special accommodations to include barrier-free housing, a wheelchair accessible bottom bunk in the cell, and wheelchair use not limited to distances. (Id. at Pg. ID 1963). These accommodations were scheduled to end on August 8, 2013. (Id. at Pg ID 1963). However, on January 14, 2013, Jindal updated Cummings' records to reflect the following reduced special accommodations: bottom bunk housing, a walker for short-distance use, and a wheelchair for long-distance use; she removed the accommodations for a barrier-free cell, wheelchair-accessible housing and wheelchair use for all distances. (Id. at Pg ID 1969). She noted that, during this visit, Cummings was able to ambulate from his wheelchair to the examination table with a slow but steady gait with some assistance – grasping surrounding objects such as a door and bookshelf. (Id. at Pg ID 1967). She renewed the updated – i.e. more limited – accommodations after seeing him on September 9, 2013 for one year. (Id. at Pg ID 1975). During the September 9th visit, Jindal encouraged Cummings to increase his exercise. (Id.).

      A little over two weeks later, defendant nurse Ellenwood treated Cummings after a fall down the stairs on September 26, 2013 which was captured on videotape. (Dkt. 15, Exhibit 5). Cummings complained of pain in his lower back and the back of his head. (Dkt. 203, at Pg ID 1976). Ellenwood saw no signs of injury to his head or lower back. Ellenwood noted that Cummings used a wheelchair for distances but that he was moved to a unit without an elevator to encourage ambulation. After he had been in healthcare for an hour, Cummings told her that he could not climb the stairs back to his cell and asked for an elevator special accommodation. Ellenwood notified Jindal of this request but Jindal declined to discuss it with him. (Id.). Ellenwood gave Cummings ice or a cold compress for his back. (Id. at Pg ID 1977). In the critical incident report, Ellenwood stated that she notified Jindal that Cummings refused to get up off the gurney and that Jindal said Cummings could "walk just fine when he wants to." (Dkt. 205, Pg ID 2037).

On September 27th and 30th, Cummings kited healthcare complaining of back and leg pain. He was scheduled for a medical visit on October 1st. (Dkt. 203, at Pg ID 1979-80). Cummings presented to healthcare on October 1st with complaints of pain. He stated that Tylenol did not help with the pain he experienced from having to crawl or scoot up and down the stairs. (Id. at Pg ID 3). This medical record reflects that the "MSP" instructed Ellenwood to let Cummings "rest a while" in healthcare after the fall. (Dkt. 203, at Pg ID 1977). This record also reflects that the "MP" was notified of Cummings complaint that he could not the climb the stairs and request for the elevator accommodation. (Id.). Jindal identifies herself as the individual who instructed Ellenwood to let Cummings rest in healthcare (Dkt. 201, at p. 10) and as the individual who Ellenwood notified of the issue regarding climbing stairs (Id. at p. 4). It appears, then, that the MSP and MP noted in the records, at least this particular record, is Jindal. On October 1, 2013, medical staff gave him a hot compress and ACE wrap and referred him to Jindal for an assessment of his pain. The nurse who treated him that day noted Cummings' complaints of pain and having to scoot on the stairs. She was unable to assess his gait but found that he was able to scoot himself around in a wheelchair using his feet and that he did not appear to be in distress. (Id. at Pg ID 1983-87). Cummings kited healthcare again on October 6, 2013, that Cummings' accommodation for a barrier-free cell was discontinued after it expired on August 8, 2013, because his wheelchair accommodation was for distances only. Kopka further indicated that Jindal is the only person who can determine accommodations. (Id.).

On October 19, Cummings submitted a request for healthcare because he fell again trying to get his wheelchair into his cell. (Dkt. 205, Pg ID 2059). On October 26, 2013, Cummings complained that he hurt his knees, hip, and lower back trying to use a shower that was inaccessible to disabled inmates. (Dkt. 205, Pg ID 2063). Cummings also stated that healthcare's failure to accommodate his disabilities made it unsafe, difficult, and painful to move in the prison. (Id.). The nurse responding to the kite stated that the information had been forwarded to the housing unit manager ("HUM") and that Cummings was scheduled to see a nurse for an evaluation of his pain. (Id. at Pg ID 2064). On October 30th, a nurse reviewed Cummings' complaints about having to crawl on the stairs and having an inaccessible cell and shower. (Dkt. 203, at Pg ID 1998). The nurse indicated that the nursing supervisor addressed the issue with the "MP." The MP stated that Cummings was able to walk up and down the

stairs and that he had an accommodation for wheelchair use for distances only. On November 2, 2013, Cummings kited healthcare again for pain from crawling up and down the stairs. (Dkt. 205, at Pg ID 2065). The responding nurse explained that if he could not walk on the stairs, he should try scooting instead of crawling. (Id. at Pg ID 2066). She further explained that Cummings could use the handrail to assist him in lowering himself to a seated position on the stair and to use his upper body strength to move along the stair treads. She said he would experience less discomfort as his strength increased. (Id.).

On November 4, 2013, Jindal reviewed Cummings' medical chart. She noted that Cummings had been complaining of frequent falls or injury due to living in a non-handicap cell. Jindal stated that they would discuss the issue at the next "CCC" visit. (Dkt. 203, at Pg ID 2000). On November 30, 2013, Cummings sent a kite to healthcare complaining of pain in his buttocks, wrist, right shoulder, lower back, hips and knees related to scooting up and down the stairs. (Id. at Pg ID 2002). The next day, non-party Nurse Velarde responded to the kite, commenting that Cummings should continue to work on increasing his strength, increase the amount of time he spends on his feet, and work on his balance and coordination. Velarde stated that Cummings could do more to improve his function himself than could be done by nursing or his medical provider. (Id.). On December 7, 2013, he submitted another kite about falling while scooting up and down the stairs, hurting himself. (Dkt. 205, Pg ID 2071). He was scheduled for an appointment for evaluation of his injury and concerns. (Id. at Pg ID 2072). Cummings saw Dr. Brady on December 9, 2013 for issues including musculoskeletal/back/knee pain. Dr. Brady noted that Cummings had an accommodation for a wheelchair for distances but appeared to use the wheelchair all the time. (Id.). Dr. Brady stated that he would discuss Cummings' issues with staff more familiar with his care to see if other accommodations were available. (Id. at Pg ID 2005). This is the last medical record until his transfer to another prison a few weeks later on January 2, 2014. (Dkt. 203, at Pg ID 2006). A physician's assistant at the new facility continued the special accommodation ordered by Jindal: bottom bunk housing, a walker, and wheelchair for distance on January 31, 2014. (Id. at Pg ID 2014). On January 13, 2015, Cummings' accommodations were changed to allow for "permanent" wheelchair use. (Id. at Pg ID 2016). On April 10, 2015, Cummings received a special accommodations order for a handicapped shower, a wheelchair pusher, and barrier free/wheelchair accessible housing on the ground floor with no

steps, in addition to the permanent wheelchair use. (Id. at Pg ID 2021, 2022).

In her affidavit attached to her motion for summary judgment, Jindal recounts the involvement she had in Cummings' medical care based on the medical record beginning in August 2012 until his transfer to another prison on January 21, 2014, as recounted above. (Dkt. 201-2, ¶¶ 3-22). She avers that, in her medical judgment, it was important to encourage Cummings to ambulate and improve his strength, rather than simply resign himself to life in a wheelchair. (Id. at ¶ 25).

R&R 2-10 (footnotes omitted).

## PROCEDURAL BACKGROUND

Plaintiff filed this suit *pro se* on March 4, 2014. [Dkt. # 1]. Roselyn Jindal, P.A., was not served until October 4, 2017. She filed a Motion to Dismiss [127] on November 30, 2017. Following its adoption of the Magistrate Judge's August 19, 2018 R&R [185], the Court issued an Order [191] granting in part and denying in part the motion. Plaintiff's ADA and Michigan medical malpractice causes of action were dismissed, but his claims for deliberate indifference for lack of proper medical accommodations and care were not. On September 12, 2019, the Court provisionally appointed counsel [192] for Plaintiff.

On October 17, 2018, after receiving permission from the Court to file a second motion under the Rule 56 standard, Defendant Jindal filed her Motion for Summary Judgment [201]. That motion was fully briefed, and the Magistrate Judge conducted a hearing on May 16, 2019. She filed an R&R [226] on August 4, 2019. Defendant filed Objections [227] to the R&R on August 19, 2019.

## STANDARD OF REVIEW

The Court conducts de novo review of objections to a Magistrate Judge's Report and Recommendation on a dispositive motion. 28 U.S.C. § 636(b)(1)(c).

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). Movant bears the burden of establishing that there are no genuine issues of material fact, which may be accomplished by demonstrating that the non-movant lacks evidence to support an essential element of his case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Non-movant cannot rest on the pleadings and must show more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd.*, 475 U.S. at 586-87. Non-movant must "go beyond the pleadings and by . . . affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp.*, 477 U.S. at 324 (quoting Rule 56(e)); *see also United States v. WRW Corp.*, 986 F.2d 138, 143 (6th Cir. 1993).

## ANALYSIS

Because the "unnecessary and wanton infliction of pain" violates the Eighth Amendment, "deliberate indifference to a prisoner's serious illness or injury states a

cause of action under § 1983." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). An Eighth Amendment deliberate indifference analysis has both an objective and a subjective component. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). These components are the grounds for Defendant's first and second objections. Defendant's third and fourth objections are to more specific findings in the R&R.

**Objection # 1: The Objective Component**

The objective component asks whether the harm inflicted by the officials' conduct is sufficiently serious to warrant constitutional protection. *Hudson v. McMillian*, 503 U.S. 1, 2 (1992). The R&R noted that after Jindal discontinued his accommodations, Cummings fell at least three more times — on September 26, October 19, and December 7 — before he was transferred to a new facility and given full wheelchair accommodations. (R&R 17). Nonetheless, despite Cummings' repeated complaints, Defendant Jindal continued to deny him wheelchair use for short distances, preferring that he attempt to walk the best that he could in order to alleviate his other medical conditions. (Id. at 18). Cummings continued to injure himself while he haphazardly maneuvered around the prison, requiring repeated trips to healthcare for pain treatments. (Id.).

Defendant in her objections cast her decision to limit Cummings' wheelchair access to "long distance" only as a legitimate medical treatment decision. Defendant cites a footnote for the proposition that "where a prisoner has received some medical

attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Westlake v. Lucas*, 537 F.2d 857, 860, n. 5 (6th Cir. 1976). This is true, but a reluctance is not a refusal, as the line following that quoted by Defendant reads, "[o]f course, in some cases the medical attention rendered may be so woefully inadequate as to amount to no treatment at all." *Id*. This court is ultimately guided by the holding that the footnote was explaining: "a prisoner who is needlessly allowed to suffer pain when relief is readily available does have a cause of action against those whose deliberate indifference is the cause of his suffering." *Westlake*, 537 F.2d at 860.

Indeed, "officials may not entirely insulate themselves for liability under § 1983 simply by providing some measure of treatment." *Jones v. Muskegon Cnty.*, 625 F.3d 935, 944-45 (6th Cir. 2010) (quoting *McCarthy v. Place*, 313 Fed.Appx, 810, 814 (6th Cir. 2008)). "[D]eliberate indifference may be established in cases where it can be shown that a defendant rendered 'grossly inadequate care' or made a 'decision to take an easier but less efficacious course of treatment.'" *Id*. From the evidence on the record, a reasonable jury could find that Cummings suffered serious harm from grossly inadequate treatment. Cummings' difficulty ambulating was well documented and routinely observed. (*See* Dkt. 205, PageID 2037; 2039-2053). Summary judgment is not appropriate where a reasonable jury could find that

requiring a 68-year-old-man to "scoot" up and down stairs when he cannot walk, despite his back pain and frequent falls, was grossly inadequate.

**Objection # 2: The Subjective Component**

The subjective component to the Eighth Amendment analysis asks whether prison officials acted with a "sufficiently culpable state of mind." *Hudson v. McMillian*, 503 U.S. 1, 20 (1992). Proving that an official was merely negligent does not establish liability. A plaintiff must prove that a prison official acted recklessly, or with wanton disregard for the health and safety of the plaintiff. *Farmer*, 511 U.S. 839-840. Plaintiff must show that Defendant "subjectively perceived facts from which to infer a substantial risk to the prisoner," that Defendant "did in fact draw the inference," and that Defendant "then disregarded that risk." *Richko v. Wayne Cty.*, 819 F.3d 907, 915-16 (6th Cir. 2016).

The Magistrate Judge found that there were ample facts from which Defendant could have inferred a serious risk of harm to Plaintiff. The R&R noted that Cummings had lived in wheelchair accessible housing accommodations from November of 2012 to September 26, 2013.[2] Indeed, Defendant Jindal originally gave the verbal order that Plaintiff be given full wheelchair accommodation and a wheelchair accessible room after Plaintiff complained in his November 28

---

[2] Defendant's objection to this date is discussed *infra* at Objection # 3.

appointment of his November 20, 2012 fall. (Dkt. 203, PageID 1957, 1963). Defendant countermanded this order following her January 14, 2013 chronic care visit with Plaintiff, where she ordered wheelchair use for long distance only (Dkt. 203; PageID 1967-1969.). Whether this change went into effect immediately, as Defendant claims, or not until September, as Plaintiff claims, is irrelevant. By mid-autumn of that year Plaintiff was falling repeatedly and complaining of pain incurred from crawling up and down stairs and crawling to the shower. (R&R 20).

Defendant Jindal was aware of Cummings' falls as late as November 4, 2013, when she wrote on his chart update "c/o frequent falls/injury due to no handicap cell." (Dkt. 203, PageID 2000). Defendant knew that Plaintiff weighed between 250 and 275 pounds and was 68-years-old, so she could easily infer that any one of these falls could be catastrophic. Given the centrality of Defendant Jindal's role in Plaintiff's treatment, a reasonable jury could certainly find that Jindal did in fact make that inference. If she did, the next step of the inquiry would ask whether she disregarded that risk.

Defendant's objection focuses on the discretion medical officials in prisons are afforded when balancing competing medical considerations. By her account, she was prodding a recalcitrant patient into exercising more in order to help him recover his strength and lessen his many health problems. To credit this account, however, would be to take the evidence in the light most favorable to Defendant, which is not

the standard. Indeed, the evidence of Plaintiff's inability to move safely around the facility, combined with Jindal's comment that he could "walk when he wants to," suggests that rather than weighing the risks of a long-distance only wheelchair assignment against its health benefits, Jindal was simply disregarding those risks.

Defendant is right that courts should not second-guess a medical practitioner's choice of one legitimate course of treatment over another. *See Estelle*, 429 U.S. at 107. Ultimately, however, the record does not establish beyond reasonable dispute that Jindal's actions were the products of measured medical decisions rather than those of a cavalier disregard of her preferred treatment plan's risks. This is therefore a question for a jury.

**Objection # 3: Date of Special Accommodations Reduction**

Plaintiff in his Amended Complaint twice states that his special accommodations were not terminated until September 26, 2013. (Dkt. 82 ¶¶ 15, 55). The Magistrate Judge credited these statements for purposes of adjudicating this motion, because Defendant had not disputed them. (R&R 4, n 2). In her objection, Defendant argues that she did in fact dispute these statements, presumably by implication, because they are contradicted by an affidavit attached as an exhibit to her motion. This affidavit merely notes what is already undisputed by all parties, that Defendant Jindal ended Plaintiff's wheelchair-accessible cell accommodations on January 14, 2013. (*See* Dkt. 201-2, PageID 1925-1926). The affidavit is silent on

when Plaintiff was actually moved to another cell. It therefore cannot be said that the date of Plaintiff's move is an undisputed fact on which summary judgment can be granted.

That aside, even if Defendant is right and Plaintiff was moved immediately following her January 14, 2013 order, the fact that Plaintiff may have avoided falls for nine months before beginning to fall frequently does not excuse Defendant's deliberate indifference to his poor condition between his September 26, 2013 fall and his transfer from the facility. When Plaintiff was moved and what Defendant observed were the effect of that move would certainly be relevant to a jury, of course. In this sense Defendant's objection has only raised another question of material fact.

**Objection # 4: Weighing Evidence**

Defendant argues that the Magistrate Judge made impermissible credibility determinations. *See Keweenaw Bay Indian Cnty. v. Rising*, 477 F.3d 881, 886 (6th Cir. 2007) ("[w]eighing of the evidence or making credibility determinations are prohibited on summary judgment"). First, Defendant argues that the Magistrate Judge erred when she determined that Mr. Cummings was "very large" and that a fall down the stairs could result in serious injury. It is not clear whether Defendant is disputing a) the R&R's statement that Cummings is six feet and seven inches tall and 250 pounds, b) that this is "very large," or c) that someone of Cumming's age and size could suffer serious injury from a fall down the stairs. These findings are

not credibility determinations, however. Mr. Cummings' height and weight were measured by Roselyn Jindal, P.A. and noted on his Chronic Care Visit reports. (*See*, e.g., Dkt. 203, PageID 1948). Taken in the light most favorable to Plaintiff, as appropriate on summary judgment, the Magistrate Judge was correct to find that a reasonable jury could find that serious injury would result if Cummings fell down a flight of stairs.

Defendant next objects that the Magistrate Judge inappropriately found that Jindal's statement that Cummings could "walk just fine when he wants to" pertained to "whether she appreciated the risk and ignored it." Again, the Magistrate Judge was not acting as a fact-finder, but only marshaling evidence that a reasonable jury could use to make a certain determination. How Jindal's statements pertained to her state of mind is a fact question, and the Court is satisfied that the Magistrate Judge referenced them as such, without making factual findings.

## CONCLUSION

The evidence, taken in the light most favorable to Plaintiff, tells a story of a man who needed special accommodations — including the full use of a wheelchair and barrier-free housing — was deprived of those accommodations, and was injured and humiliated as a result. Defendant interprets the evidence in a light more favorable to her position. She suggests that she limited Plaintiff's wheelchair use in

an effort to build up his strength and ameliorate his more serious health problems. A jury, not a judge, must choose between these two competing narratives.

A prison system that forces its inmates to crawl, shimmy, scoot, or stagger up and down stairs is more medieval than modern. At least in Humpty Dumpty's time none would have the audacity to suggest that when one lets a fragile man fall one does his health a favor. Prisons punish those whom they confine, but they do not exist to shatter them. Drawing all factual inferences in Plaintiff's favor, the MDOC's restriction of Mr. Cummings' accommodations was an affront to the Constitution and a betrayal of all in this state who benignly trust that their prisons are being operated in a just and civilized manner. That this may be an isolated incident is little comfort to the Court: an egg only need crack once before it is lost. A prisoner can seek damages under § 1983, but the federal courts cannot put him back together again.

The Report and Recommendation [226] is hereby **ADOPTED** and entered as the findings and conclusions of the Court.

**IT IS ORDERED** that Defendant's Motion for Summary Judgment [201] is **DENIED,** and her Objections [227] to the R&R are **OVERRULED**.

**SO ORDERED**.

/s/Arthur J. Tarnow_____
Arthur J. Tarnow
Dated: September 27, 2019       Senior United States District Judge